FILED

AUG 30 2018

Clerk, US District Court
District of Montana - Billings

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MID CONTINENT CASUALTY COMPANY, | CV 17-41-BLG-SPW |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| ALAN ENGELKE, DRY PRAIRIE RURAL WATER AUTHORITY, and DOES 1-10, | |
| Defendants. | |

Before the court are Defendant Alan Engelke's Motion for Summary Judgment (Doc. 41), Defendant Dry Prairie Rural Water Authority's Motion for Summary Judgment (Doc. 45), and Plaintiff Mid Continent Casualty Company's Motion for Partial Summary Judgment (Doc. 49). For the following reasons, Defendants' motions are granted in part and denied in part, and Mid-Continent's Motion for Partial Summary Judgment is granted in part and denied in part.

## I.    Statement of Facts

In the fall of 2013, Dry Prairie hired Alan Engelke, an excavator in northeastern Montana, to assist in extending Dry Prairie's water lines to real property owned by Joseph Picard. (Doc. 55-5 at 12:18-23). Dry Prairie needed

1

Engelke to dig a trench on Picard's property, in which Dry Prairie would place underground water lines for a new house on the property. (*Id.* at 15:10-17). At that time, Engelke had an independent contractor's exemption with the State of Montana. (Doc. 47-2 at 38:20-24).

After Dry Prairie marked the excavation route, Engelke spoke with Picard and looked over the property. (Doc. 50-1 at 26:2-4; Doc. 55-1 at 14:5-15:8). Picard advised Engelke that there were underground lines beneath the property, including a saltwater disposal line from an oil well (the Anvil Well) approximately three quarters of a mile away. (*Id.*). Based on his work in the field, Engelke knew that a salt water disposal line is used to transfer salt water from the oil pump to a salt water recovery station during the oil pumping process. (*Id.* at 14:15-15:16). Based on Picard's description of where he thought the salt water line was located, Engelke believed his excavation trenching would not reach the salt water line. (*Id.* at 14:5-15:8). Picard also told Engelke that there would be some lines that may not be in use any more and not to worry about them. (*Id.* at 14:8-10; 14:25-15:3).

Engelke also contacted Montana's One-Call Notification Center to obtain information concerning the location of underground facilities on Picard's property. (*Id.* at 8:6-9). A One-Call ticket was generated on September 29, 2013, identifying those individuals or entities registered with the Notification Center with underground facilities in the area of Engelke's proposed work. (*Id.*). While some

lines were identified on the ticket, the saltwater disposal line was not, since the then-owner of the Anvil Well, Windy Butte, had not registered the location of the line with the Notification Center. (Doc. 47-3 at 65:10-19).

Shortly after obtaining the One-Call ticket, Engelke began his excavation. (Doc. 55-1 at 8:6-10). He provided his own equipment and insurance for the job. (Doc. 47-2 at 37:14-22). While excavating, Engelke felt a "pop," and both ends of a line came to the surface. (*Id.* at 8:8-17). The line was not in use and appeared to Engelke to be abandoned. (*Id.* at 10:8-15). After hitting the line, Engelke spoke with Picard. Picard told Engelke that he also believed the line was abandoned because a local construction company had previously hit a line fairly close to the one Engelke hit, which they determined had been abandoned. (Doc. 47-4 at 15:23-16:25). Picard went out to see the line and told Engelke he was pretty sure the line was abandoned and that any active line ran elsewhere. He told Engelke that if it were him, he would bury the line. (*Id.* at 25:20-23). Engelke buried the line and finished the project. (Doc. 50-2 at 23:25-24:5). He billed Dry Prairie a set amount for the job. (Doc. 47-2 at 38:11-15).

Unfortunately, Engelke had hit the saltwater disposal line, which was placed back into operation a few months later. (Doc. 50-3 at 39:11-14). Because of the damage to the line, salt water running through the line was discharged into the ground, causing damage. (*Id.* at 39:11-40:11). By the time the line was placed

3

back into service, the Anvil Well with which the saltwater disposal line was associated, had transferred ownership twice. (*Id.* at 57-5 at ¶ 4). At the time the discharge occurred, the Anvil Well was, and still is, owned by Avery Bakken. (*Id.* at ¶¶ 3-4). It is disputed whether the saltwater disposal line at issue transferred with the Anvil Well during the ownership transfers. (Doc. 53-1 at 73:2-76:18).

Nevertheless, Avery Bakken was charged by the State Oil and Gas Commission to clean up the release. (*Id.*) Mid-Continent insured Avery Bakken's loss. (Doc. 54-3). Mid Continent now stands in Avery Bakken's shoes seeking subrogation. The parties have stipulated that all previous owners of the Anvil Well during the relevant time frame are the same company for purposes of this lawsuit.

## II.     Applicable Law

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. There must be a genuine dispute as to any material fact, which is a fact "that may affect the outcome of the case." *Id.* at 248.

4

In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and the court must construe all facts in the light most favorable to the non-moving party. *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir.2009) (citation omitted). When presented with cross-motions for summary judgment on the same matters, the court must "evaluate each motion separately, giving the non-moving party the benefit of all reasonable inferences." *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

## III. Discussion

Under the Montana Dig Law, codified at Mont. Code. Ann. § 69-4-501, *et seq.*, owners of underground facilities like water lines or fiber optic cables register their underground lines with a One-Call Notification Center. Prior to excavating in a particular area, an excavator must call into the Notification Center and provide the location of their intended excavation operations. The Notification Center issues a ticket that identifies the registered underground lines in the area. The ticket is provided to the excavator and the registered owners of the underground lines existing in that particular location. The underground owners then have a period of time to go onsite and mark the location of their lines so that the excavator does not hit them. The Dig Law also provides direction in the event that an excavator encounters unmarked underground facilities during excavation.

Mid-Continent argues that once Engelke uncovered the saltwater disposal line, he had a duty, evidenced by certain sections of the Dig Law, to stop his excavation operations and advise the line owner or the One-Call Notification Center that he had damaged the line. (Doc. 45 at 8-9). Mid-Continent argues that summary judgment on liability is appropriate because Engelke did not stop excavating and instead buried the line, allowing the damage to remain, which ultimately resulted in property damage once the Anvil Oil well was placed back into service and saltwater leached out of the damaged line. (Doc. 49 at 8-13). Mid-Continent asserts this duty exists under both a common law negligence theory and a negligence per se theory. (Doc. 49, Doc. 54 at 27).

Dry Prairie asserts that Mid-Continent is not entitled to maintain this subrogation action because it has not made its insured/subrogor whole. Additionally, Defendants argue that Mid-Continent's negligence per se theory fails because Engelke did not breach the statute and Mid-Continent is not a member of the class the statute intends to protect. (Doc. 43 at 6-8; Doc. 45 at 4-8). Defendants argue that Mid-Continent's common law negligence claim is pre-empted by Montana's Dig Law, codified at Mont. Code Ann. 69-4-501, *et seq*. (Doc. 43 at 5; Doc. 45 at 4). Engelke argues that Mid-Continent, through its subrogors, acted negligently per se by failing to be a member of the One-Call Notification Center. (Doc. 42 at 8). Dry Prairie also argues that even if Mid-

6

Continent's common law claim is not pre-empted, Mid-Continent cannot establish a prima facie case of negligence because it does not have an expert who can establish that Engelke's actions were negligent. (Doc. 52 at 6-9). The court addresses each of these arguments in turn.

### 1. Mid-Continent is Entitled to Pursue Subrogation

In Montana, an insured must be "totally reimbursed for all losses as well as all costs" before the insurer is entitled to seek subrogation against a third party. *Swanson v. Hartford Ins. Co. of Midwest*, 46 P.3d 584, 587 (Mont. 2002). Dry Prairie argues that Mid-Continent has not reimbursed Avery Bakken for the full amount Avery Bakken paid out for property damage resulting from the saltwater release. (Doc. 52 at 4). As a result, Dry Prairie argues that Mid-Continent cannot pursue its claim for subrogation under Montana law. The undisputed facts before the court reflect otherwise.

Jeff Avery testified by affidavit that Mid-Continent fully paid Avery Bakken for all the amounts Avery Bakken paid in connection with the saltwater release. (Doc. 61-1 at 8). Additionally, in its discovery responses, Mid-Continent sets out all the amounts it expended on clean up, including those amounts paid to Avery Bakken, which amounts to full reimbursement. (*See* Doc. 55-4 at 2). Dry Prairie has not produced any evidence that disputes Avery's testimony or the amounts listed in Mid-Continent's discovery responses. Accordingly, the court finds that

Mid-Continent is entitled to stand in the shoes of Avery Bakken and its subrogation claim may lawfully proceed.

### 2.    Mid-Continent's Claims are not Preempted

Relying on the recent case *AT&T Corporation v. Jackson Utilities, LLC*, 2017 WL 2296994 (D. Mont. 2017), Defendants argue that Mid-Continent's common law negligence claims are preempted by the Montana Dig Law, Mont. Code Ann. § 69-4-501 *et seq.*, so only Mid-Continent's negligence per se claim may move forward. The court disagrees.

First, Defendants read the court's preemption determination in *Jackson* too broadly. There, AT&T brought negligence and negligence per se claims against Jackson, an excavator, because Jackson damaged an AT&T underground fiber optic cable while excavating. *Id.* at *6. AT&T's negligence claim centers on the damage Jackson caused to its fiber optic cable during excavation. *Jackson,* 2017 WL 2296994 at *1. In contrast, Mid-Continent's negligence claims focus on Engelke's conduct *after* he damaged the saltwater disposal line, and the ensuing saltwater release that stemmed from that conduct, not damage to the line itself. (*See* Doc. 61 at 11, stating "[t]he focus is on Engelke's negligent acts and omissions *after* he struck and damaged the Line and the cause of damages that flowed from those negligent acts and omissions." (Emphasis in original)).

The distinction between AT&T's claim and Mid-Continent's claim is critical. While the Dig Law carves out statutorily-mandated remedies and damage fees for excavator-caused damage to underground facilities like fiber optic lines and saltwater disposal lines, *see* Mont. Code Ann. § 69-4-505(1)-(2), it does not address restoration damages that stem from excavator-caused damage to the underground facility, like a saltwater release. In other words, the Dig Law declares excavators' duties with respect to calling, reporting, and trenching while located within the vicinity of underground facilities, and sets out liability and damages when excavators damage underground facilities. *See gen.* Mont. Code Ann. § 69-4-501, *et seq.* As a result, under Montana law, no common law claim may exist with respect to such claims. Mont. Code Ann. § 1-1-108, ("there is no common law in any case where the law is declared by statute."). Accordingly, under circumstances like those in *Jackson*, a claimant may bring a claim for a statutory violation, but not a negligence claim, whether it be common law or negligence per se.[1]

---

[1] In *Jackson*, Judge Morris concluded that AT&T's independent common law negligence claim against Jackson for damage to its fiber optic line was preempted under the circumstances, but that AT&T's negligence per se claim survived. *Id.* It appears that Judge Morris equated a negligence per se claim with a claim for statutory violation, thereby determining that the negligence per se claim could survive. But common law negligence claims and negligence per se claims survive together or die together, because in the end, they are both negligence claims.

Significantly, however, the Dig Law specifically provides that remedies other than those covered by the Dig Law may be pursued in the event of an excavator's negligence. *See* Mont. Code Ann § 69-4-505(4) ("[t]he act of obtaining information as required by this part . . . does not excuse the excavator from liability for any damage or injury resulting from the excavator's negligence."). This language signals that the Legislature intended to carve out specific statutory remedies for damages caused to underground facilities, but no more. In other words, claims for restoration damages, like Mid-Continent's, are not preempted by the statute, and may proceed under a negligence theory. The court turns to those two theories.

### 3. Negligence Per Se

Defendants allege that Mid-Continent cannot sustain a negligence per se claim because Engelke did not violate Mont. Code Ann. § 69-4-503(6) and Mid-Continent is not a member of the class the Legislature intended to protect. Engelke also argues that while he complied with the Dig Law, Mid-Continent, through its subrogors, did not because they did not register with the One-Call Notification Center and Mid-Continent is thus negligent per se.

To establish negligence per se in Montana, a plaintiff must prove five elements; (1) the defendant violated a particular statute; (2) the statute was enacted to protect a specific class of persons; (3) the plaintiff is a member of that class; (4)

10

the plaintiff's injury is the sort the statute was enacted to prevent; and (5) the statute was intended to regulate a member of defendant's class. *Edie v. Gray*, 121 P.3d 516, 520 (Mont. 2005). Common law negligence, on the other hand, is the failure to use the degree of care that an ordinarily prudent person would have used under the same circumstances. *Id.*

"One key distinction between negligence per se and ordinary negligence is that once a violation of a statute is proven, and the [five standards above] are met, a defendant is negligent, as a matter of law." *Estate of Schwabe v. Custer's Inn Associates, LLP*, 15 P.3d 903, 908 (Mont. 2000). "The effect of negligence per se is to stamp the defendant's conduct as negligence, with all the effects of common law negligence, but with no greater effect. There will still remain open such questions as the causal relationship between the violation and the harm to the plaintiff, and, in the ordinary case, *the defenses of contributory negligence*[.]". *Giambra v. Kelsey*, 162 P.3d 134, 144 (Mont. 2007) (quoting Keeton, *The Law of Torts* § 36, at 230) (emphasis in original). Liability does not become fixed upon a showing of negligence per se, however; there must also be a "determination of whether the violation was the proximate cause of the alleged injuries." *Id.* (internal citations omitted).

A. **Five Elements of Negligence Per Se**

1. **Both Engelke and Mid-Continent violated Montana statutes.**

a. **Engelke violated § 69-4-503(6), MCA.**

Section § 69-4-503(6), MCA, expressly required that when Engelke "discover[ed] an underground facility that ha[d] not been located and marked," he had to "stop excavating in the vicinity of the facility and notify the facility owner or the one-call notification center." Dry Prairie argues that Engelke did not violate the statute because he notified Picard, the real property owner, about the damage, and Picard may have been the presumed owner of the saltwater disposal line. (Doc. 45 at 6; Doc. 52 at 7).

In support of this argument, Dry Prairie argues that it is not clear whether the saltwater disposal line transferred with the Anvil oil well when Windy Butte sold the well to Avery and again when the well was transferred to Avery Bakken. (Doc. 53 at 3). Dry Prairie asserts that because the saltwater disposal line may not have been included in the sale of the oil well, Picard, as the fee simple owner of the real property on which Engelke was excavating, was the default owner of the saltwater disposal line, located under the property. (Doc. 45 at 6). So, Dry Prairie argues, when Engelke notified Picard about the damage to the line, Engelke fulfilled his duty under the statute to notify the facility owner. (*Id.*). The court finds this argument unpersuasive.

Under the Dig Law, Engelke's obligation to stop excavating and notify the line owner or the Notification Center was contemporaneous with his discovery of and damage to the line. *See* § Mont. Code Ann. 69-4-503(6). It is undisputed that at the time Engelke discovered and damaged the saltwater line, Windy Butte owned the oil well and the saltwater disposal line. (Doc. 57-5 at ¶ 4). Windy Butte sold the oil well to Jeff Avery sometime in November 2013, after Engelke had completed his job. (Doc. 50 at ¶15). So even if Picard was, in fact, the fee simple owner of the saltwater disposal line *at the time of the saltwater release*, his ownership is irrelevant because it came about after Engelke's trenching activities concluded. Accordingly, the court finds that Dry Prairie's argument that Engelke satisfied the statute by notifying Picard has no merit.

Next, Engelke argues that he did not violate Mont. § 69-4-503(6), because this subsection of the Dig Law does not apply when the facility owner does not register with the One-Call Notification Center. (Doc. 51 at 7). Engelke is essentially arguing that Mid-Continent is not a member of the class the statute is intended to protect. The court discusses and rejects this argument below.

It is undisputed that Engelke did not call Windy Butte or the Notification Center. As a result, the court finds that Engelke did, in fact, violate the statute.

### b. Mid-Continent, through its subrogors, violated § 69-4-502(2)(a), MCA.

In his motion for summary judgment, Engelke argued that Mid-Continent's failure to be a member of the one-call notification center program, through its subrogors, violated § 69-4-502(2)(a), MCA, a separate provision of the Montana Dig Law. (Doc. 42 at 6-8). Mid-Continent failed to respond to this argument. (*See gen.* Doc. 56).

At the time of the release, § 69-4-502(2)(a), MCA, provided that:

> A public utility, municipal corporation, underground facility owner, or person having the right to bury underground facilities must be a member of a one-call notification center covering the service area in which the entity or person has underground facilities.

It is undisputed that neither Windy Butte nor Avery Bakken had ever been a member of the one-call notification statute, as required by the Montana Dig Law. (Doc. 43 at ¶ 18; Doc. 57 at ¶ 7). Accordingly, the court finds that Mid-Continent, through its subrogors, violated the statutory requirement mandating that underground facility owners be a member of a one-call notification center covering the relevant service area.

### 2. The Montana Dig Law was enacted to protect facility owners, excavators, and the general public.

In considering whether to enact the Dig Law, the Legislature considered testimony from underground facility owners that "[f]ar and away the greatest cause of damage to their underground [ ] facilities [was from] third-party damage or dig-

ins," *id.* at 10 (statement of Bob Warner, gas engineer for Montana Power Co.),

and that the statute, "would be most useful for [contractors and utility owners] and

will protect their facilities and services." *Id.* at 5 (statement of Dan Walker, U.S.

West Communications). Ultimately, the Legislature determined that providing a

centralized call center that underground facility owners "must" be a member of,

and requiring excavators to advise the underground facility owner or the

Notification Center about an unmarked underground facility would protect

underground facility owners, excavators, and the public. *See gen. Hearing before

the Committee on Business & Economic Development, House of Representatives,*

52nd Legislature (March 14, 1991). Based on the legislative history and the

statutory language, it is clear to the court that the statute is intended to protect

underground facility owners and excavators, as well as the general public.

> ### 3. Engelke and Mid-Continent, through its subrogors, are a part of the protected class.

>> #### a. Mid-Continent is part of the protected class because the Dig Law protects member and non-member underground utility owners.

Despite the fact that Mid-Continent, through its subrogors who are

underground facility owners, seems to fall squarely within the class the Legislature

intended to protect, Defendants argue that Mid-Continent is not part of the

protected class because the Dig Law does not protect non-members of the

Notification Center. (Doc. 45 at 6; Doc. 51 at 7). Defendants' argument seems to be refuted by the plain language and legislative history of the statute.

Defendants are correct that Mont. Code Ann. § 69-4-502(2)(a) requires any underground facility owner to be a member of the one-call notification center covering the service area in which the entity or person has underground facilities. But Defendants are wrong that membership is a predicate for all rights and obligations under the Dig Law. In fact, the section Engelke violated contemplates that excavators may encounter underground facilities that have not been located or marked, *see* Mont. Code Ann. § 69-4-603(6), a situation that is certain to arise when a facility owner is not a member of the Notification Center.

To a large degree, safety was the impetus for the Dig Law and in it, the Legislature placed the onus on the excavator who discovered the unmarked facility to notify the facility owner or the Notification Center. *See* § 69-4-503(6). The Legislature considered that the Notification Center maintains "information centrally available to all who might excavate." *See Hearing on Senate Bill 335 before the Senate Business and Industry Committee, Montana Senate*, 52nd Legislature (February 18, 1991) (statement of Senator Jerry Noble) at 4. Presumably, that is why the statute provides that if an underground facility is damaged, and the excavator cannot find the facility owner, he must call the Notification Center. *See* § 69-4-503(6). The Notification Center may relay or

16

retain information and provide it if and when the facility owner becomes a member, and an unintended release could be averted. *See Hearing on Senate Bill 335 before the Senate Business and Industry Committee, Montana Senate*, 52nd Legislature (February 18, 1991). (statement of Gene Philips, representative of Pacific Power and Light)("[A] contractor or excavator can call in and get all of the information with respect to the people with the facilities . . . so they know what (sic) construction in that area.").

Additionally, the liability section of the statute contemplates repairs owed to non-member underground facility owners. *See* Mont. Code Ann. § 69-4-505(1)(a). Under this section, excavators who fail to obtain information as to the underground facility's location are liable for damages to the underground facility, regardless of whether the facility owner is a member of the Notification Center. *Id.* In the event the facility owner is a member, however, the excavator is also liable for an additional damage fee. *See* Mont. Code Ann. § 69-4-505(1)(a)(i)-(iii). These additional damages would be unnecessary if non-members were not contemplated under the class.

Finally, in the statute's legislative history, the Legislature acknowledged that not all facility owners participate in the service and may not register with the Notification Center. *See Hearing on Senate Bill 335 before the Senate Business and Industry Committee, Montana Senate*, 52nd Legislature (February 18, 1991)

(statement of Senator Jerry Noble) at 4. Yet, the issue of imposing penalties on the facility owners for not being members was raised and rejected in the same hearing. *Id.* at 6 ("it is a voluntary service") (statement of Bud Crier, representative of the underground utility location center). From 1991 to 2013, no substantive changes were made to the language of the statute evidencing that the Legislature's position on this issue did not change during that timeframe. In other words, in 2013, the fact that underground facility owners did not register as members with the Notification Center was not a basis to exclude them from protection under the statute. The court finds that Mid-Continent is part of the protected class.

### b. Excavators like Engelke are also part of the protected class.

As noted above, the Legislature specifically determined that the law was enacted to prevent excavators, among others. *See gen. Hearing before the Committee on Business & Economic Development, House of Representatives,* 52nd Legislature (March 14, 1991) (providing a centralized call center and requiring excavators to advise the underground facility owner or the Notification Center about an unmarked underground facility would protect underground facility owners, excavators, and the public.) The court finds that Engelke is also a part of the protected class.

### 4. The Legislature intended the Dig Law to prevent both Mid-Continent's and Engelke's Injuries

The release caused by Engelke and Mid-Continent's violations of the Dig Law is the sort of damage the Legislature was attempting to prevent by implementing the Dig Law. The statute itself indicates as much. "[I]ncidents," are defined as "violations of [the statute] by an excavator that . . . results in damage to an underground facility or the property of a third party . . . ." Mont. Code Ann. § 69-4-501(7). Preventing these incidents, which were characterized as "a safety issue for all of Montana," is precisely what the Senate discussed with respect to this legislation. *See Hearing on Senate Bill 335 before the Senate Business and Industry Committee, Montana Senate*, 52nd Legislature (February 18, 1991) (Statement of Sen. Jerry Noble, SD 21, Cascade and Lewis & Clark Counties) at 4, 8, 9 (stating, "[u]nderground construction is among the most dangerous construction around . . . the public [has] a major risk that someone may not have marked a line. At the very least tearing up utility lines is going to cost both the utility and the contractor money, disrupt service, and delay the project. At the extreme end striking a power line . . . could kill or severely injure . . . others."). Preventing these types of injuries may only occur if the underground facility owner and the excavator comply with the statute as mandated. The court finds that Mid-Continent and Engelke's injuries were exactly the type the Legislature intended to prevent.

### 5. The Legislature intended to regulate members of Engelke's class and Mid-Continent's class

Based on the plain language of the statute, underground facility owners and excavators are the members regulated under the Dig Law. Engelke is an excavator, and Mid-Continent's subrogors were underground facility owners. The court finds this element is established with respect to Engelke and Mid-Continent. Because all five negligence per se elements are established with respect to both parties, the court finds Engelke and Mid-Continent negligent per se.

### B. Causation & Damages

As noted above, establishing the existence of negligence per se settles only the questions of duty and breach. A plaintiff still must prove causation before he may recover. *Estate of Schwabe v. Custer's Inn*, 15 P.3d 903, 912 (Mont. 2000) *overruled on other grounds* by *Giambra v. Kelsey*, 162 P.3d 134 (Montana 2007). Mid-Continent contends that Engelke's violation of the duty was cause-in-fact of the release. Conversely, Engelke and Dry Prairie argue that Mid-Continent's subrogors' failure to register with the Notification Center, also a violation of the statute, caused the release. Defendants' argument is a comparative negligence argument.

Montana's comparative and contributory negligence scheme "requires the fact-finder to consider the negligence of the claimant, injured person, defendants, and third-party defendants, even if a party proceeds under a claim of negligence

per se. . . ." *Giambra*, 162 P.3d at 147; *see also Edie*, 121 P.3d at 520 (stating "even in negligence per se cases, the fact finder must apportion negligence between the two parties in reaching its verdict."). The Montana Supreme Court has concluded that a jury may weigh or compare evidence of negligence from a statutory violation that constitutes a proximate cause of the injury along with other evidence of negligence on the part of both parties. *Reed v. Little*, 680 P.2d 937, 941 (Mont. 1984). Thus, even when a defendant is negligent as a matter of law, the issue of contributory negligence on the part of the plaintiff "is normally an issue for the jury or fact finder to resolve." *Pierce v. ALSC Architects, P.S.*, 890 P.2d 1254, 1260 (Mont. 1995).

Considering the facts before the court, a jury could decide that Mid-Continent's negligence per se and/or Engelke's negligence per se was a cause - perhaps even the primary cause - of Mid-Continent's and/or Engelke's injuries.

### 4.    Mid-Continent's Common Law Negligence Claim

"Negligence is the failure to use the degree of care that an ordinarily prudent person would have used under the same circumstance." *Barr v. Great Falls International Airport Authority*, 107 P.3d 471, 477 (Mont. 2005). To maintain a negligence action, a plaintiff must prove duty, breach, causation and damages. *Fisher v. Swift Transportation Co., Inc.*, 181 P.3d 601, 606 (Mont. 2008).

Mid-Continent makes two negligence arguments. First, it argues that Engelke had a duty, evidenced by Mont. Code Ann. §§ 69-4-503(6), to stop his excavation operations and advise the line owner or the Notification Center that he had damaged the line. (Doc. 45 at 8-9). Because the court has already determined that Engelke was negligent per se for violating Mont. Code Ann. § 69-4-503(6), it need not re-examine the questions of duty and breach with respect to this theory of negligence.

Second, Mid-Continent also argues that a common law duty exists under Mont. Code Ann. § 69-4-505(4) for Engelke to act as a reasonable and prudent excavator, and that Engelke breached that duty, causing the release and that summary judgment is appropriate.

## A.    Duty

"The existence of a legal duty and the scope of any duty are questions of law." *Fabich v. PPL Montana, LLC*, 170 P.3d 943, 947 (Mont. 2007). In Montana, a common law duty may arise from a statutorily imposed obligation. *Fisher,* 181 P.3d at 606-07. Usually under Montana law, courts consider two factors when determining whether a duty exists: (1) "whether the imposition of [a] duty comports with public policy" and (2) "whether the defendant could have reasonably foreseen that his or her conduct could have resulted in an injury to the plaintiff." *Id.* (citations omitted).

22

Here, Mont. Code. Ann. § 69-4-505(5) states:

"The act of obtaining information as required by this part does not excuse an excavator making any excavation from doing so in a careful and prudent manner, nor does it excuse the excavator from liability for any damage or injury resulting from the excavator's negligence."

As to the first factor, because the duty is statutorily imposed, "the Legislature has already given ample consideration to the [] public policy implications" and the court need not discuss them further. *Fisher*, 181 P.3d at 608. The court's analysis of the legislative history above demonstrates that imposition of a duty comports with public policy considerations.

With respect to the next factor, the Montana Supreme Court has recognized that "existence of a duty turns primarily on foreseeability." *Id.* Specifically, the question is "whether the defendant could have reasonably foreseen that his or her conduct could have resulted in an injury to the plaintiff." *Id.* (internal quotations omitted). A plaintiff is a foreseeable plaintiff if she or he is within the "foreseeable zone of risk" created by the defendant's negligent act. *Id.* (citing *Prindel v. Ravalli County*, 133 P.3d 165, 178 (Mont. 2006)). The particular accident that ensues need not be foreseen, however. *Prindel*, 133 P.3d at 179. Where a duty is established by statute, the court must look to the class of people the statute intended to protect to determine whether the plaintiff is a member of that class. *Fisher*, 181 P.3d at 607.

The court concludes that Mid-Continent is a foreseeable plaintiff in these circumstances. First, the statutes at issue were enacted to prevent "incidents," or "violations of [the statute] by an excavator that . . . results in damage to an underground facility or the property of a third party . . . ." 69-4-501(7), MCA; *see also AT&T Corp.*, 2017 WL 2296994 ("The Montana Legislature enacted the Montana Dig Law to protect underground facility owners [] from damage to their property, and to protect contractors [] from liability for damages."). As noted above in the negligence per se analysis, Mid-Continent, through its subrogors – owners of an underground facility damaged by Engelke – is undisputedly a member of the protected class. *See Fisher*, 181 P.3d at 607 (finding Fisher, as a licensed driver, part of the protected class when the statute protected "persons entitled to use the highway.").

Second, it is undisputed that Engelke hit an unmarked underground facility and then buried it without contacting the line owner or the Notification Center. So the question is whether Engelke could have reasonably foreseen that his conduct could have resulted in injury to Mid-Continent, through its subrogors. For the following reasons, the court concludes he could have.

Even if the only duty that Engelke owed to Mid-Continent was the common law duty to exercise reasonable care, Mid-Continent would be a foreseeable plaintiff because Mid-Continent's subrogors' saltwater disposal line was within the

24

zone of risk created by Engelke's alleged negligence. Engelke testified that, at the time he hit the line, he knew the purpose of a saltwater disposal line, and was familiar with all the mechanisms of oilfield operations. (Doc. 55-1 at 13:6-16). He also knew that an oil well, which used a saltwater disposal line, and a saltwater line, were located near his excavation site. (*Id*). He knew that the saltwater disposal line was unmarked. (*Id.*). Additionally, Picard had advised Engelke that another construction company had hit a line in the area that was not the saltwater disposal line, so Engelke also knew the saltwater line remained buried. (Doc. 47-4 at 15:23-16:25).

Because of his knowledge of oilfield operations combined with knowing a potential saltwater disposal line was nearby, the court concludes that Engelke could have foreseen that the line he had damaged and reburied had the potential to result in an unintended release. He knew that the saltwater line was associated with an active well, and thus could be placed back into service at some point. He knew that if the line was damaged, and placed back into service, an unintended release could occur. Thus, one cannot reasonably dispute that the owner of the saltwater line was within a "foreseeable zone of risk" created by Engelke's failure to notify the saltwater disposal line owner or the Notification Center about the damage to the line. *Fisher*, 181 P.3d at 607; *see also Prindel*, 133 P.3d at 178. Mid-Continent was a foreseeable plaintiff to whom Engelke owed a legal duty.

## B.     Breach

Dry Prairie argues that because Mid-Continent failed to produce expert testimony regarding the "prudent and careful manner" standard applicable to excavators under MCA § 69-4-505(4), Mid-Continent cannot establish breach under the statute without an expert.  The court agrees.

Expert witness testimony is required in certain negligence cases to establish the elements of duty, breach, and causation when those issues are "sufficiently beyond the common experience of the trier of fact and the expert testimony will assist the trier of fact in determining the issue or understanding the evidence." *Dubiel v. Montana Department of Transportation*, 272 P.3d 66, 70 (Mont. 2012); *Tin Cup County Water and/or Sewer District*, 200 P.3d 60, 69 (Mont. 2008) (concluding expert opinion testimony was required where the issues of causation were "beyond the common experience and understanding" of lay jurors).  In a situation where expert testimony is required to prove a plaintiff's negligence claim, but the plaintiff does not present expert testimony, summary judgment dismissing the claim is warranted. *Dubiel*, 272 P.3d at 70.

The Montana Supreme Court has reasoned that because "juries composed of laymen are normally incompetent to pass judgment" on questions of whether "reasonable care" was exercised in undertaking "work calling for a special skill[,]" there can be "no finding of negligence in the absence of expert testimony to

support it." *Brookins v. Mote*, 292 P.3d 347, 362 (Mont. 2012) (quoting *Deaconess Hosp. v. Gratton*, 545 P.2d 670, 672 (Mont. 1976)). In other words, where the standard of care must be established by expert testimony, it is well-established that without such expert testimony, "no genuine issue of material fact exists and the defendant is entitled to judgment as a matter of law." *Estate of Willson v. Addison*, 258 P.3d 410, 414 (Mont. 2011).

When Engelke hit the underground facility, he was trenching and excavating. Trenching and operating an excavator is a skilled trade. *Texas Emp. Ins. Ass'n v. Bewley*, 560 S.W.2d 147, 149 (Tex. Civ. App. 1977) (A machine operator is a member of a skilled trade). Further, the determination of whether Engelke violated a duty to conduct the excavation in a "prudent and careful manner" is beyond the common experience of the trier of fact. *See Wilderness Development, LLC v. Hash,* 606 F.Supp. 2d 1275, 1280 (D. Mont. 2009) (collecting Montana cases) (holding that standards of care applicable in a negligence action against a professional or skilled tradesman are outside common experience, and require expert testimony to establish the standard of care). Because Mid-Continent does not have an expert who can testify to what is considered "careful and prudent excavating," Mid-Continent cannot prove breach and summary judgment on Mid-Continent's common law negligence claim under Mont. Code Ann. § 69-4-505(4) is appropriate.

## 5. Vicarious liability

Mid-Continent argues that Dry Prairie is vicariously liable for Engelke's negligence because Engelke acted as a subcontractor/independent contractor for the "prime contractor" Dry Prairie. (Doc. 49 at 14). Relying on *St. Paul Companies v. Construction Management Company, LTD*, 96 F.Supp.2d 1094, 1097 (D. Mont. 2000), Mid-Continent argues that Dry Prairie, as the prime contractor, had a common law duty to ensure that Engelke's work was completed in a good and workmanlike manner. The court disagrees.

In *St. Paul Companies*, the court analyzed whether a general contractor could be held vicariously liable to a homeowner for his subcontractor's negligence. *Id.* at 1096. Because general contractors in Montana have a common law duty to construct homes in a good and workmanlike manner, the court held that the general contractor could be liable to the homeowner for the acts of his subcontractor, even if the subcontractor was an independent contractor. *Id.* at 1097. The court's holding was narrowly limited to the particular factual scenario before it. No homeowners are involved in this case, and no similar common law duty exists under Montana law between Dry Prairie and Mid-Continent or Mid-Continent's subrogors. Accordingly, the court finds that *St. Paul Companies* has no application here.

The record does not support Mid-Continent's argument that Engelke acted as Dry Prairie's agent. "An individual is an agent of another when that other has the right to control the details, methods, or means of accomplishing the individual's work." *Butler v. Domin*, 15 P.3d 1189, 1194 (Mont.2000) (citations omitted). Four factors help determine whether the right of control is sufficient to give rise to an agency relationship: "(1) direct evidence of right or exercise of control; (2) method of payment; (3) furnishing of equipment; and (4) right to fire." *Id.* (citation omitted). In an agency relationship, the principal is liable for the negligent acts of an agent that is acting within the scope of its agency. Mont. `Code Ann. § 28-10-602(1); *see also Beckman v. Butte-Silver Bow County*, 1 P.3d 348, 393 (Mont. 2000) (Vicarious liability may attach where an agency relationship exists).

Montana statute provides that an "agency is actual when the agent is really employed by the principal." Mont. Code Ann § 28-10-103(1). "An individual is an employee of another when that other has the right to control the details, methods, or means of accomplishing the individual's work." *Butler v. Domin*, 15 P.3d 1189, 1191 (Mont. 2000) (collecting Montana cases). In contrast, a person who hires an independent contractor is not generally liable for the contractor's torts. *Beckman*, 1 P.3d at 393. "The law itself makes no presumption of agency, and the burden of proving agency, including not only the fact of its existence but

also its nature and extent rests ordinarily upon the party who alleges it." *Elkins v. Huskey Oil Company*, 455 P.2d 329, 332 (Mont. 1969).

There are no facts suggesting that Dry Prairie controlled or sought to control the "details, methods, or means" of Engelke's excavation. It is undisputed that Engelke provided his own equipment, consulted with the property owner on his own, obtained the one-call notification on his own, and was paid by the job, not by the hour. Each of the above factors cuts against Mid-Continent's argument for vicarious liability. The Montana Supreme Court has concluded that such factors discredit assertions of actual agency. *Elkins*, 455 P.2d at 332 (affirming a motion for summary judgment on the issue of agency where a gas station owner was unrestricted in his ability to determine the daily business hours and the methods of doing business).

Mid-Continent argues that Dry Prairie asserted control over Engelke's work when it marked out the path for Engelke to take during his excavation operations. This argument is not persuasive. In order for Engelke to know where to dig, Dry Prairie had to tell him where it needed the trench. So, Dry Prairie showed Engelke where it wanted him to excavate. By doing so, Dry Prairie no more exerted control over Engelke than any other business that hires an independent contractor and tells the contractor the location of the job site.

It is also undisputed that Engelke held an independent contractor exemption certificate at the time of the excavation. In order to obtain this exemption, Montana law required Engelke to swear and acknowledge that he was free from control or direction over the performance of his services and that he was engaged in an independently established business. *See* Mont. Code Ann. § 39-71-417(4)(a). His status as an independent contractor was "conclusively presumed" upon approval of his application. Mont. Code Ann. § 39-71-417(7)(a). Mid-Continent has not provided any evidence to refute this presumption.

Because the undisputed facts demonstrate that Engelke was acting as an independent contractor, there is no basis to hold Dry Prairie vicariously liable. Accordingly, Mid-Continent's vicarious negligence claim against Dry Prairie is subject to summary judgment.

## III. Conclusion

For the reasons set forth above summary judgment is granted on the duty and breach provisions of Mid-Continent's common law negligence claim arising out of Mont. Code Ann. § 69-4-503(6), but denied on the claim arising out of § 69-4-505(4). Defendants Dry Prairie and Engelke's motion is granted with respect to Mid-Continent's negligence claim arising out of § 69-4-505(4), but denied with respect to the claim arising out of § 69-4-503(6). Engelke's motion that Mid-Continent is negligent per se for violating §69-4-502(2)(a) is granted. Dry

Prairie's motion for summary judgment is granted on vicarious liability. To clarify, Mid-Continent has established that Engelke had a duty to Mid-Continent as evidenced by Mont. Code Ann. § 69-4-503(6), and breached that duty. Engelke has established that Mid-Continent had a duty to Engelke as evidenced by § 69-4-502(2)(a), and breached that duty. Causation and damages as a result of both parties' statutory violations are reserved for the jury.

DATED this 30th day of August 2018.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge